**Nora I. GIBBONS, Administratrix of the Estate of Joseph E. Gibbons, Deceased,**

v.

**UNITED STATES of America, United States Maritime Commission.**

**No. 127 of 1952.**

United States District Court
E. D. Pennsylvania.
Oct. 18, 1954.

Freedman, Landy & Lorry, by William M. Alper, Philadelphia, Pa., for libellant.

Krusen, Evans & Shaw, by Mark D. Alspach, W. Wilson White, U. S. Atty., Philadelphia, Pa., for respondent.

GRIM, District Judge.

On the morning of September 9, 1951, the S. S. John S. Mosby, while crossing the Atlantic Ocean, was warned that a storm of hurricane proportions was approaching. By noontime the deck gang under the supervision of Chief Mate Joseph E. Gibbons had prepared the ship for the storm. Among other things, the deck gang carefully and properly lashed three open 55-gallon oil drums used as garbage cans to the stern railing toward the port side of the ship.

The storm began at about 2:00 o'clock in the afternoon. Anthony Bellitti, the helmsman on the 12:00 to 4:00 P.M. watch, testified that at 4:00 P.M. that afternoon the Captain told him to tell Gibbons "to go back aft and see what is the trouble back there." Two or three minutes later Bellitti communicated this order to Gibbons. Bellitti knew nothing of Gibbons' activities between 4:00 P.M., when this order was given, and 8:15 P.M., when the accident involved in the present case happened.

Peter Karas, the boatswain, testified that at about 8:15 that evening Gibbons "told me that the captain gave him orders for him and I to go aft. The chief engineer had called the bridge—that he was taking water into the steering room. So both of us were to go aft." An analysis of this hearsay testimony will appear later in the opinion.

Gibbons and Karas proceeded on the main deck to the vessel's stern. At that time (8:15 P.M.) the vessel was pitching heavily. The wind velocity was as high as seventy or eighty miles an hour and heavy seas from twelve to twenty-five feet high were coming over the stern about every fifteen seconds. Karas and Gibbons clung to a railing which ran athwartship at the after end of the gun crew's quarters (or after house) on the main deck. Karas then began a series of round trips from the railing out to the cover of the hatch which opens into the steering engine room below. He found that the hatch cover was on and in place but there was an opening about a half inch wide and a foot and a half long on the after or hinge side of the cover. Making about three trips out to the cover when the stern rose between the seas, over a period of two minutes, Karas tightened the nuts around the cover in an effort to close the opening, but he could not close it completely be-

cause, as he discovered the following day, a gasket was rotten and the cover was bent and sprung. Gibbons did not go out to the hatch cover at all.

While Karas and Gibbons were at the stern they saw that the three oil drums, which had been lashed to the stern railing, had broken loose from their lashings and that only one drum was left and that it was being buffeted about the deck by the seas. While Karas was making one of his trips out to the hatch cover, Gibbons ran out to the oil drum but found that it was still attached to the rail by a single length of rope. When Karas finished attempting to tighten the hatch cover, he and Gibbons decided to get out of their exposed position. A few seconds later the next sea came in. Karas jumped behind a ventilator and Gibbons stood next to him toward port. Karas held onto the railing with one hand and to Gibbons' arm with the other, while Gibbons clung to the railing with both hands. As the wave came in it caught the open end of the oil drum, filled it with water and hurled it into the air against Gibbons, striking him on the right leg, chest and abdomen and causing the injuries for which this suit has been brought.

After Gibbons was injured both men worked their way around the corner of the after house and went inside to the armed guard's quarters. In the deck of the armed guard's quarters is an opening or entrance to the steering engine room. Karas looked through this opening and saw that the Chief Engineer was in the steering engine room and that there were only three inches of water on the floor plates measured at the deepest point as the ship rolled. It should be noted that the steering engine room could be reached by a safe route inside the ship from the engine room through the shaft alley. It should also be noted that the steering engine and all the apparatus connected thereto in the steering engine room can be operated for a long time even when there is four feet of water in the steering engine room. Karas noticed that the water was still leaking very slowly through the hatch cover despite his previous efforts to close the gap. Karas left Gibbons in the armed guard's quarters, made his way forward and obtained the help of others in getting Gibbons to his quarters amidships.

Because of his injuries Gibbons remained in his bunk and was unable to work the remainder of the voyage. Upon the ship's arrival at Antwerp, Belgium, on September 21, 1951, he entered a hospital where he remained until October 8, 1951. Still unable to work, he was repatriated by respondent and arrived in the United States on October 22, 1951. At that time walking was still difficult and painful for him and his knee was swollen. However, the swelling responded satisfactorily to epsom salt baths and the application of heat pads administered by Gibbons and his wife at their home. After the swelling subsided Gibbons, wearing an elastic knee support, returned to work on January 15, 1952, and made a voyage on the Isaac Sharpless. After the end of that voyage he died suddenly on April 5, 1952, from a heart attack which was totally unrelated to the accident in question in the present case.

■ Inasmuch as Gibbons received maintenance and cure in kind up to the date of his return to the United States, libellant (who is Gibbons' widow and the administratrix of his estate) is not entitled to any sum for this period, but she is entitled to recover maintenance and cure for the period from October 22, 1951 to January 15, 1952, when Gibbons reshipped, or a period of 85 days. Therefore, libellant is entitled to an allowance for 85 days at $8 per day or a total of $680 for maintenance and cure.

■ Except for maintenance and cure, however, libellant has failed to make out a case of liability against the respondent either on the theory of negligence or of unseaworthiness. With respect to her allegation of negligence, libellant contends that the injury to Gibbons' knee was caused by the negligent order of the Captain in requiring Gibbons to perform non-essential work,

that is, work wholly unnecessary for the preservation of either the ship or the cargo, in a situation of obvious and great peril. This contention is clearly without merit for there is no evidence in the record, admissible or otherwise, that the Captain ordered Gibbons to go out on the deck to fix the hatch cover during the hurricane.

Libellant has conceded that the Captain's first order to Gibbons ("to go back aft and see what is the trouble back there"), which was transmitted to Gibbons through Bellitti at 4:00 P.M., more than four hours before the accident, was equivocal and had no connection with the accident. Karas' testimony concerning the Captain's second order was that at about 8:15 P.M. Gibbons "told me [Karas] that the captain gave him orders for him and I to go aft. The chief engineer had called the bridge—that he was taking water into the steering room * * *." Respondent's counsel has objected to the admission of Karas' statement, which is obviously hearsay, that the chief engineer had informed the bridge that water was leaking into the engine room. However, even if all of Karas' testimony in reference to the Captain's order were admissible, libellant would still have failed to establish negligence on the part of respondent, for this testimony clearly does not establish that the Captain directed Gibbons either (1) to go up on deck to check the leakage of water into the steering engine room below or (2) to attempt to tighten the hatch cover on the deck during the hurricane. The most that this order testified to by Karas would indicate is that Gibbons was instructed by the Captain to proceed to the rear of the vessel to check on the leakage of water into the steering engine room. Such an order by the Captain certainly could not be considered an act of negligence in view of the fact that Gibbons could have viewed the leakage situation in the steering engine room from the inside of that room and that he could have reached the steering engine room by a safe route inside the ship without having exposed

himself to the dangerous seas on deck. Making an inside inspection would have been the prudent thing for an experienced seaman like Gibbons to do. Such an inspection would have disclosed to him that the amount of leakage was too insignificant to justify the great risk involved in his going out on deck during a hurricane to attempt to tighten down the hatch cover which was the apparent source of the leakage.

Libellant also makes the alternative claim that respondent should be held liable on the basis of the unseaworthiness of the vessel, contending that the leaking hatch cover can be considered the cause of Gibbons' injuries. There would be some merit to this claim if the defective hatch cover actually had created a situation of danger to ship or cargo which made it necessary for Gibbons to expose himself to hurricane seas in order to fasten down the cover. However, libellant's evidence is clearly to the contrary. There is no doubt that the condition of the hatch cover resulted in a leak of only minor importance, which was clearly insufficient to require anyone to correct the condition under the dangerous circumstances existing at the time of the accident. Therefore, I find that the unseaworthy hatch cover was not the cause of Gibbons' injuries.

To summarize: (1) There is no evidence of a negligent order by the Captain that Gibbons expose himself to the dangerous situation which resulted in his injuries. (2) The evidence does not sustain libellant's contention that the unseaworthiness of the hatch cover required Gibbons to expose himself on deck to the perils of the hurricane. (3) Libellant is entitled to maintenance and cure for the time Gibbons was home between voyages recuperating from his knee injury.

The statements of fact and law appearing in this opinion will constitute the Court's findings of fact and conclusions of law in the case.

Libellant will submit a proposed judgment in accordance with the foregoing opinion.